**SO ORDERED.**

**SIGNED this 11 day of April, 2008.**



_____

**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

DESIGNATED FOR PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BRUCE EARL ANDERSON,** | ) | **Case No. 05-19222** |
| | ) | **Chapter 7** |
| Debtor. | ) | |

### <u>MEMORANDUM OPINION</u>

Creditors Central Plains Steel, Inc. and Salina Steel, Inc. object to debtor Bruce E. Anderson's homestead exemption on the basis of 11 U.S.C. § 522(o).[1] They assert that Anderson enhanced the value of his homestead by paying down his home mortgage with the proceeds of property that he disposed of with intent to hinder, delay, or defraud his creditors within 10 years of

---

[1] Dkt. 66 and 70.

-1-

the date of his petition as provided for in § 522(o).[2]  The Trustee initially joined in this objection, but omitted from the final pretrial order her objection on the basis of § 522(o).[3]  The debtor objects to the claims filed by Central Plains and Salina Steel, challenging both entities' standing as creditors.[4]  The Court conducted an evidentiary hearing on this matter on November 13, 2007.  Central Plains Steel appeared by Lawrence D. Greenbaum of McAnany, Van Cleave & Phillips, P.A.  Salina Steel appeared by Larry G. Michel and Chris J. Kellogg of Kennedy Berkley Yarnevich & Williamson, Chartered.  Debtor appeared by J. Michael Morris of Klenda, Mitchell, Austerman & Zuercher, L.L.P.  The Trustee, Linda S. Parks, appeared by Scott Hill of Hite Fanning Honeyman, LLP.  Having reviewed the evidence and received briefs from the respective parties,[5] the Court is ready to rule.

### Jurisdiction

---

[2]  This case was filed on October 14, 2005.  The provisions of § 522(o), as contained in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), became effective on the date of enactment, April 20, 2005. *See* BAPCPA, § 1501(b)(2), Pub. L. 109-8, Title XV, Apr. 20, 2005, 119 Stat. 216, *reprinted at* 11 U.S.C. § 101 Note.  Unless otherwise noted, all statutory references are to Title 11, U.S.C. § 101 et seq (Thomson/West 2008).

[3]  Dkt. 21 and 245.  Both creditors, along with the Trustee, also objected to Anderson's homestead exemption under § 522(p), asserting that by paying down his home mortgage, Anderson had "acquired an interest" in the homestead within 1215 days and was subject to the statutory cap.  This Court previously denied the Trustee's motion for partial summary judgment under § 522(p) and held that payment of home mortgage debt secured by a homestead does not result in the acquisition of an "interest" within the meaning of § 522(p). *See* Dkt. 173 reported at *In re Anderson*, 374 B.R. 848 (Bankr. D. Kan. 2007).

[4]  Dkt. 115 (Objection to Central Plains claim number 20); Dkt 117 (Objection to Salina Steel claim number 22).

[5]  Dkt. 293 and 294.

The Court has jurisdiction over this contested, core proceeding.[6]  Venue is proper in the District of Kansas.[7]

**Facts Pertaining to the Claims**

Before determining whether Anderson's homestead exemption withstands these creditors' objections, the Court must first decide whether Central Plains and Salina Steel are indeed creditors of Anderson and allow their claims.  The facts concerning these steel suppliers' standing as creditors are as follows.

Anderson owned several entities.  His principal business was the manufacture and sale of lifts for storing and servicing automobiles.  Aerotech Designs, Inc. ("Aerotech") manufactured the lifts and Auto Lifters of America, L.L.C. ("Auto Lifters") marketed them.[8]  Anderson also owned a business called U.S. Credit L.L.C. which financed the purchase of equipment used in manufacturing the lifts.  Anderson owned all or a controlling share of the stock or equity in each of these entities. He held all of the executive offices of each entity and was the only director.  Aerotech was organized in 1991 and its manufacturing facility was located in Newton.  Auto Lifters was organized in 1989 and its business office was located in Andover.  Prior to 1989, Anderson ran a lift business, apparently as a sole proprietor doing business as Auto Lifters.  Aerotech and Auto Lifters ceased operations in late April of 2005.  Anderson also owned an unrelated entity called Park City Investors, L.L.C., a company that acquired and sold real property in Park City, Kansas and whose

---

[6]  28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of exemptions or claims) and § 1334(b).

[7]  28 U.S.C. § 1408 and 1409(a).

[8]  Auto Lifters is a debtor in chapter 7 case filed in this Court, case no. 06-10071. Aerotech Designs was an alleged debtor in an involuntary case filed in 2005, case no. 05-19160. That case was closed without the entry of an order for relief.

-3-

activities will be detailed later in this opinion.

Central Plains began selling steel to Anderson in 1985. Central Plains began by invoicing Auto Lifters but, by the time the lift business folded in 2005, was invoicing Aerotech. Central Plains' credit manager testified that he did not really differentiate between the two entities, and that he knew Anderson owned both. After Auto Lifters and Aerotech went out of business, Central Plains sought and obtained a consent judgment in the principal amount of $162,392 against the two companies on August 2, 2005 in the District Court of Sedgwick County, Kansas.[9] There is no contract, guaranty, or other writing shown that would support a contractual relationship of any kind between Central Plains and Anderson individually or personally. Any standing that Central Plains has in this case is predicated on its being able to pierce the corporate veil of these entities and hold Anderson personally accountable for their debts. Central Plains asserts a claim of $172,403.41 for steel sold from January to April of 2005.[10]

Salina Steel also has a judgment. It was entered November 9, 2005 against Auto Lifters for steel sold in the amount of $188,232 in the District Court of Saline County, Kansas.[11] More importantly, Salina Steel asserts an individual claim against Anderson based upon his execution of a guaranty on October 22, 2004.[12] Salina Steel's credit manager testified that she obtained a security interest in the steel Salina Steel shipped to Aerotech and Auto Lifters on October 22, 2004 and, at

---

[9] Ex. 2.

[10] *Id.*

[11] Ex. 3 (Ex. 8 contained within). When initially filed in May of 2005, Salina Steel's suit named Anderson as a party defendant; due to his intervening bankruptcy filing, Salina Steel was unable to pursue a judgment against him personally.

[12] Ex. 3 (Ex. 3 contained within).

-4-

the same time, obtained personal guaranties from Anderson and his son, Cameron Anderson, who managed the plant.[13]  In general, Salina Steel invoiced Auto Lifters but received payment from Aerotech for its product.[14]  Salina Steel asserts a claim of $188,232.62 for product sold February 15, 2005 to April 21, 2005 on account to Auto Lifters and guaranteed by Anderson.[15]

Anderson challenges Salina Steel's guaranty claim on the ground that he signed the guaranty, not personally, but as president of Aerotech.  He argues that he intended to bind Aerotech on Auto Lifter's debts, not himself.  The guaranty states that it is made to induce Salina Steel to extend credit to Auto Lifters and is signed "Bruce Anderson, Pres.," but does not name an entity for which Anderson purports to sign.

The text of the guaranty[16] states in part:

> The undersigned hereby requests you to extend credit, from time to time, to Autolifters of America, Inc., hereinafter referred to as "Borrower," which would be evidenced by accounts payable to Salina Steel Supply, Inc.  The undersigned hereby guarantees the payment of said account in full.

> It is expressly understood and agreed by the undersigned that the liability hereunder shall in no manner be dependent or conditioned upon this instrument being signed by any other person or persons, and that it is not executed under the consideration or representation that any other person or persons shall sign the same.

* * *

> Dated at Andover, Kansas, this 22nd day of October, 2004.

---

[13]  Ex. 3 (Ex. 2 contained within).  The Court notes that Auto Lifters only is identified as the debtor in the security agreement.

[14]  Ex. 3 (Ex. 1 contained within consists of Salina Steel billing statements issued to Auto Lifters).

[15]  Ex. 3.

[16]  Ex. 3 (Ex. 3 contained within).

Guarantor:

/s/ Bruce Anderson Pres.
Bruce E. Anderson

The Court admitted testimony from both Anderson and Salina Steel's credit manager, Marilyn Marietta, concerning Salina Steel's request for a guaranty. Anderson testified that he intended to sign the guaranty on behalf of Aerotech because, in his words, Aerotech was Salina Steel's customer. Aerotech was the end-user of the steel and Aerotech paid the bills. He also stated that in his discussions with Marietta on October 22, 2004, she asked that an officer execute the documents she had presented. According to him, she did not specify that the guaranty be personal.

Marietta says that she specifically asked Anderson for a personal guaranty in the October 22, 2004 conversation. By that time, Auto Lifters was in substantial arrears to Salina Steel. She stated that without the guaranty, Salina Steel would not have shipped any more product. She stated that on September 29, 2004, Cameron Anderson told her that he ran the company and would execute the security agreement and a guaranty in order to preserve shipment of materials. After Cameron signed and returned both documents, Marietta ascertained that he was not an officer of the company and that Bruce Anderson was. She called him on October 22, 2004 and faxed him the documents which Anderson himself executed and returned via facsimile. Marietta did not notice in 2004 that Anderson had signed his guaranty as "Pres." Salina Steel continued to ship material to Aerotech after the guaranty was signed and submitted.

**Facts Pertaining to the Disposition of Anderson's Non-Exempt Real Estate Assets**

Prior to 1998, Anderson found a six acre tract of land north of Wichita at 61st Street and I-35 highway that had commercial development potential. With his brother-in-law, Tony Udden, he formed Park City Investors, L.L.C. ("PCI")to acquire and hold this land for resale. In 1998, PCI

-6-

sold part of the tract to CBOCS West, Inc. for $569,000. CBOCS erected a Cracker Barrel Restaurant on that site. According to the seller's statement for this transaction, from these proceeds, Anderson received $138,418 representing funds he had loaned to PCI. After other deductions, the net payout to PCI was $332,331.79. From that amount, PCI bought and paid for two houses on or adjacent to the Cracker Barrel site for $122,387. PCI also moved four houses off the Cracker Barrel tract and sold them at auction for $36,295. Of the auction amount, PCI retained $10,000. Anderson and Udden split the net of the CBOCS sale proceeds after paying for the two houses.

Shortly thereafter, Udden declared bankruptcy and, in July of 1998, PCI redeemed Udden's membership leaving Anderson the sole member of PCI. To redeem Udden's membership, PCI purchased land in Andover, Kansas to convey to Udden in a tax-free exchange for his interest in the company. The redemption agreement was signed and closed in July and the land purchase and trade was accomplished in September of 1998. In order to effectuate this transaction, PCI needed $220,000. Anderson testified that his accountant advised that a loan be taken out of Auto Lifters. He withdrew the money from Auto Lifters in an undocumented loan to him as a shareholder. This loan was never repaid. There is no dispute that Anderson controlled Auto Lifters and caused this loan to be made.

Then, in April of 2002, PCI made an agreement to sell the remainder of the initial PCI investment property to Hattan Properties, L.L.C. When this transaction closed, PCI received the gross price of $484,887. Net proceeds to PCI were $444,749.42. Of this amount, Anderson distributed $219,000 to Auto Lifters. In June of 2002, Auto Lifters transferred that amount back to Anderson who funded two certificates of deposit at Conway Bank, each in the amount of $100,000. No proof was presented concerning the fate of the other $19,000.

-7-

When Auto Lifters and Aerotech began to lose money after 2003 and incur difficulties maintaining vendor payments, Anderson cashed one of the CDs and, in March of 2005, obtained a personal line of credit of $100,000 from the Citizens State Bank of Hesston, secured by a $100,000 CD at that bank and acquired with the proceeds of the Conway Bank CD. Anderson drew $75,000 down on that line and disbursed the loan proceeds to Aerotech ($50,000) and Auto Lifters ($25,000) during 2005. The fate of the other CD will be discussed later.

The balance of the proceeds of the second PCI sale were paid to Bruce Anderson ($20,000), to Bruce and Lana Anderson ($53,000 for taxes), and to U.S. Credit ($150,000). Lana Anderson is Bruce's wife. She is a practicing dentist and is not a debtor in this proceeding. On November 8, 2002, U.S. Credit paid Aerotech $100,000 as a loan. Auto Lifters also deposited $20,000 in Aerotech's account that day. Aerotech never repaid the $100,000 U.S. Credit loan.

PCI sold its remaining Park City property in April of 2002 to Hattan Properties and received $139,227.25.[17] This sum was used to purchase Sumner County real property that was like-kind exchanged and sold, resulting in the deposit of $106,831.82 in PCI's Intrust Bank account in November of 2003, of which $96,287.27 were disbursed to Bruce Anderson on September 20, 2004.

In July of 2005, Anderson sold a tract of land in Newton, where the Aerotech manufacturing facility had been located, to Robert Coleman. Coleman paid $150,000 for the land and $50,000 for the equipment. Because the equipment was pledged to Citizens State bank of Hesston, it received $8,600. A Newton bank holding the mortgage on the land received about $71,000. After other

---

[17] The Court understands this property to be the house tracts adjacent to or on the Cracker Barrel tract that were acquired with the proceeds of the first PCI sale to CBOCS West, Inc.

-8-

deductions for costs and taxes, Anderson received $115,734.61.[18]  At least part of this amount he deposited into an account at Capital Federal Savings, his home mortgage lender.

The Hesston bank paid the balance of its line of credit to Anderson with his pledged $100,000 CD and refunded him $33,368.64.[19]  This amount, along with the proceeds of the remaining Conway Bank CD mentioned above, $107,385.21, were deposited in the Capital Federal account.

Thus, it appears to the Court that non-exempt assets of $240,000 were converted to Anderson's exempt homestead.  Those non-exempt assets included (1) the Conway Bank $100,000 CD acquired in 2002 with proceeds from the second PCI real estate sale; (2) the $115,000 net proceeds from the sale of the Newton facility and property in July of 2005; and (3) the $33,000 proceeds remaining of the $100,000 CD used to secure the Hesston Bank $100,000 line of credit.

**<u>Anderson's Home</u>**

In 1998, Anderson and his wife purchased a large home that abuts the North golf course at Crestview Country Club in East Wichita.[20]  The Trustee's appraiser valued this property at $636,000.  The home is subject to a substantial mortgage held by Capitol Federal, and, on July 18, 2005, shortly before this case was filed, Anderson paid Capitol Federal $240,000 by debiting his Capitol Federal account.[21]  According to the schedules filed in this case, Capitol Federal is owed approximately

---

[18]  Ex. J.

[19]  Ex. L.

[20]  From the previous proceedings on the § 522(p) objection to Anderson's homestead exemption, the Court is aware that the home was acquired in December of 1998 for $350,000. *See In re Anderson*, 374 B.R. 848, 851 (Bankr. D. Kan. 2007).

[21]  Anderson filed his chapter 7 petition on October 14, 2005. *In re Anderson, supra* at 851.

Case 05-19222    Doc# 296    Filed 04/11/08    Page 9 of 27

$170,000 after receiving the $240,000 payment.[22]  In his bankruptcy filings, Anderson claimed the home exempt and scheduled the value of the home at $411,800.[23]  Anderson significantly increased the equity in his homestead by making this transfer and did so from funds that would have been otherwise available to his creditors in this case.  When directly questioned by the Court about his motivation in making this payment, Anderson stated, "I don't know."

### Anderson's Conduct of the Businesses

Anderson did not conduct the day to day management of his companies, but he did exert significant control over their financial and business affairs.  As noted above, he owned a controlling or absolute interest in all of them.  He was the sole director or member of each entity and held all executive or managerial positions.  Auto Lifters and Aerotech were both incorporated with the assistance of an attorney.  Anderson conceded that after preparing the organizing documents and minutes for Auto Lifters and Aerotech, he did not conduct shareholder or director meetings, nor did he prepare and maintain minutes of annual meetings.  Auto Lifters and Aerotech did file tax returns and corporate annual reports every year.  Auto Lifters and Aerotech also maintained separate books and records and separate bank accounts.

Both Aerotech and Auto Lifters operated on thin capital.  Anderson initially paid in about $66,000 in capital to Auto Lifters and that amount remained stable throughout the life of the company.  According to the Auto Lifters' tax returns, the company's retained earnings were greater than zero until 2004.  While the shareholders' equity continued to diminish throughout this period, Anderson denied that he thought the company was "struggling."   He attributed its difficulties to

---

[22] *Id.*

[23] Dkt. 9, Schedule C.

Chinese competition and the increased cost of materials (*e.g.* powder coating finish). By 2004, Auto Lifters had a considerable order backlog of over 100 lifts. It was unable to procure the components to complete the lifts in work-in-progress. Auto Lifters had accepted orders and credit card deposits from numerous customers but was unable to deliver goods. Intrust Bank cleared credit card deposits for Auto Lifters and eventually sued the company for over $200,000 it paid as a result of this backlog.

However, in 1998, when PCI "borrowed" the $220,000 to redeem Udden's interest, Auto Lifters was comfortably solvent. Even after the loan was made, the company had retained earnings of over $100,000. By the end of 2002, that amount had dwindled to about $34,000. By the end of 2003, retained earnings had plummeted to <$248,000>. There is nothing to suggest that Anderson made the PCI loan in 1998 with no intent to pay it back other than the fact that on several occasions, PCI had more than sufficient funds to do so and did not. It is significant that from July 15, 2004 to March of 2005, Aerotech continued to pay both Salina Steel and Central Plains (and many other suppliers) on some of their invoices.[24] Anderson historically received salary from both companies but does not appear to have taken extraordinary draws in this period. When the companies began to experience financial difficulties in 2004, Anderson ceased taking a salary.[25] He personally borrowed money, secured in part by the Conway Bank CD acquired with PCI real estate sales proceeds, to fund the operations of the companies.

Anderson has a high school education, sixteen credit hours of college and is a retired

---

[24] *See* Ex. A (showing payments to Salina Steel and Central Plain from the Aerotech account in March of 2005).

[25] *See* Ex. D and Ex. E. Anderson received no salary in 2004 and 2005 from either Auto Lifters or Aerotech.

fireman. He does not appear to have had any formal business or accounting training. He testified that after his businesses closed in July of 2005, he suffered, and continues to suffer severe depression. Anderson has not worked since. At the time of trial and during the discovery period, he was taking Xanax and Zoloft for that malady. He did not demonstrate much intimate familiarity with any of the details of his businesses, leading the Court to suspect that he was intellectually overwhelmed by the responsibility of dealing with three or four separate entities. After Udden left PCI, Anderson appears to have been the only equity holder in each of these entities, assisted only by his son, Roland Boesker, plant managers, and his bookkeeper.

Anderson fully disclosed the conversion and transfers noted above in his Statement of Financial Affairs.[26]

### Conclusions of Law

### A.    Claims Objections and Standing

### 1.    In General

In order for either of these creditors to succeed on their objections to Bruce Anderson's homestead exemption, they must have standing as creditors in this bankruptcy case. To be creditors, they must have a claim.[27]  To have a claim, they must show that they possess a right to payment.[28] If they have such a claim, the Court must allow it except to the extent the claim is unenforceable against the debtor under any agreement or applicable law.[29]

---

[26]  *See* Dkt. 8, Question Nos. 3, 4, 10, and 11.

[27]  § 101(10)(A).

[28]  § 101(5)(A).

[29]  § 502(b)(1).

-12-

Properly-filed claims are entitled to the presumption of validity.[30]  In order for an objection to a claim to be sustained, the objecting party must meet the presumption of validity, thereby shifting the burden of proof to the claimant.[31]  Here, the debtor has successfully met the presumption with respect to both claims.  In the case of Salina Steel, the debtor met the presumption about that claim's validity based upon debtor's alleged execution of the guaranty in a representative rather than a personal capacity.  Because Salina Steel never questioned the irregularly-executed instrument, the Court concludes that it must bear the burden of proving that the guaranty is in fact a personal one.

Central Plains bases its claim on an assertion that debtor and Auto Lifters are alter egos of one another.  This, of course, is relief that is sparingly and reluctantly granted.  Debtor meets the presumption of the validity of Central Plains' claim because there is absolutely no documentation that would suggest his personal contractual liability to Central Plains.  Accordingly, the burden of proving its claim shifts to Central Plains.  We now turn to the validity of the creditors respective claims.

### 2.      Salina Steel's Guaranty Claim

Bruce Anderson's execution of the Salina Steel guaranty as "Pres." creates a question about whether he is personally liable to Salina Steel.  He asserts that he intended to bind Aerotech, not himself, on the guaranty.  To determine this issue, the Court reviews the guaranty and determines whether it is ambiguous on this point and, if it is, the Court looks to extrinsic evidence concerning Anderson's intentions.[32]  The Court concludes from a "four corners" review that the guaranty is not

---

[30]  § 502(a).

[31]  Fed. R. Bankr. P. 3007.

[32]  *Botkin v. Security State Bank*, 281 Kan. 243, 248, 130 P.3d 92 (2006) (The rules governing interpretation and construction of contracts apply to a contract of guaranty.); *TMG*

ambiguous and, for that reason, the Court will not consider the parol evidence offered at trial in determining whether Anderson is liable on it.[33] While the existence of the second entity, Aerotech, and its relationship with Salina Steel may give rise to an ambiguity, that ambiguity arises from circumstances extrinsic to the instrument itself, not from an ambiguity within it. Thus, the Court concludes that parol evidence should not control its decision here.

First, the guaranty signed by Anderson names no corporation other than Autolifters. It makes no reference to Aerotech in any way. Further, the language of the guaranty suggests that liability for the obligations it imposes will be "personal" in nature. The second full paragraph states, "[i]t is expressly understood and agreed by the undersigned that the *liability hereunder shall in no manner be dependent or conditioned upon this instrument being signed by any other person or persons*, and that it is not executed under the consideration or representation that *any other person or persons* shall sign the same."[34] This language clearly speaks of "other persons" which suggests to the Court that its maker is also intended to be a natural person or individual, not an entity. Finally, the manner in which the signature block is structured cuts against any interpretation of this document as a corporate obligation of Aerotech. As the Kansas Court of Appeals noted in *Zukel v. Great West Managers, L.L.C.,* representative signatures by corporate officers should follow a certain format:

> The proper mode of execution by a corporation is to state the name of the corporation, followed by the names of the officers with capacity, preceded by the

---

*Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 242, 898 P.2d 1145 (1995) (Extrinsic evidence cannot be used to construe an unambiguous agreement.).

[33] *TMG Life Ins. Co., supra* (If a contract is unambiguous, the court can look only to the four corners of the agreement to determine the parties' intent.).

[34] Emphasis added. Ex. 3 (Ex. 3 within).

word "per" or "by," and followed by the title of the officers.[35]

This signature block fails that test on every point, except that Anderson handwrote his title next to his signature. The signature block itself identifies "[g]uarantor" as "Bruce E. Anderson," without any identifier of Anderson. No corporate entity appears anywhere in the signature block. Only the name "Bruce E. Anderson" is typewritten under the signature line, without reference to any identifier, title or office. The Court concludes that the typewritten signature block clearly indicates that this guaranty was intended to be a personal guaranty executed by the named individual. Anderson's form of execution is not inconsistent with this intent.

Several Kansas appellate decisions have construed guaranties to be personal notwithstanding the signer's addition of his office behind his signature. *McBride Elec., Inc. v. Putt's Tuff, Inc.* considered a combined corporate note and personal guaranty that the officers of Putt's Tuff signed. The officers protested that by signing as officers, they should escape personal liability. The court there concluded that sustaining this argument would ". . . elevate form over substance and allow them to escape by subterfuge a clear expression of personal liability. It would also have the untenable result of making the guarantor of the note the same corporation which was primarily liable thereon. Such a promise of guaranty would be illusory only; we cannot interpret the guaranty provision in such an illogical manner."[36] And, in *Consol. Beef Industries, Inc. v. Schuyler*, the Kansas Supreme Court concluded from several references in the body of the guaranty, including a

---

[35] 31 Kan.App.2d 1098, 1102-03, 78 P.3d 480 (2003), citing 7 *Fletcher Cyc. Corp.* §§ 3032, 3034 (1997); see also 2A *Fletcher Corp. Forms* § § 2154, 2158, and 2160 (4th ed.1998) (suggesting this mode in order to preclude personal liability of officer).

[36] 9 Kan. App.2d 548, 554-55, 685 P.2d 316 (1984).

Case 05-19222    Doc# 296    Filed 04/11/08    Page 15 of 27

provision that the guaranty obligation was binding not only on the maker, but also his heirs and personal representatives, that the maker's obligation was unambiguously personal and not corporate in nature.[37]  While none of these cases involves the two corporation scenario posited by Anderson here, each reinforces the idea that the guarantor's addition of his office to his signature, standing alone, is insufficient to shield him from personal liability when the contract suggests otherwise.

Even were this Court to conclude that the guaranty was intrinsically ambiguous, the extrinsic evidence shows that the guaranty requested was personal in nature and that Anderson, despite his denials, made a personal guaranty.  After hearing the testimony of Ms. Marietta and Anderson, the Court is convinced that the parties intended that Anderson personally guarantee the obligations of Auto Lifters.  Ms. Marietta typed "Bruce E. Anderson" under the signature line and under the heading of "Guarantor" on the guaranty form, without reference to any other entity and without reference to Anderson's title or office.  Her testimony that she discussed a personal guaranty with him is entirely credible, given the company's practice of requiring personal guarantees on corporate accounts that became slow paying.  She did not testify concerning a discussion of a guaranty from Aerotech.  Anderson testified that the parties never discussed a personal guaranty.  He did not state that the parties discussed a corporate guaranty either.

If Anderson argues that Aerotech was the true debtor of Salina Steel, his avowed intention to have Aerotech guarantee Auto Lifters' obligation to Salina Steel seems illusory.  This is especially true where Auto Lifters applied to Salina Steel for credit, not Aerotech.  And, Anderson did not specify which company he was representing when he signed the guaranty.   In the absence of any reference to Aerotech in the guaranty, this Court cannot conclude that the guaranty binds

---

[37]  239 Kan. 38, 43, 716 P.2d 544, 549 (1986).

Aerotech. Finally, this Court also compares Anderson's signature on the security agreement executed on behalf of Auto Lifters and observes that it was in proper corporate form.[38] His signature on the guaranty is not.

Salina Steel's claim should be allowed in the amount of $186,912.21 against Anderson's estate[39] and, by virtue of having a claim, Salina Steel is a creditor with standing to object to Anderson's homestead exemption.

### 3. Central Plains

In order to be a creditor in this case and to have standing in this contested matter, Central Plains must successfully pierce the corporate veil of Auto Lifters and Aerotech and demonstrate that these companies were Bruce Anderson's alter ego. This relief is not frequently accorded and is difficult to obtain. Kansas law permits piercing the veil when some fraud or injustice is perpetrated upon parties dealing with a corporation. In *Kilpatrick Bros. v. Poynter*, the Kansas Supreme Court outlined the general rule of when an owner and a corporation can be considered alter egos. It said:

> Thus we see the doctrine of alter ego fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards corporate entity and holds the individual responsible for his acts knowingly and intentionally

---

[38] Ex. 3 (Ex. 2 within).

[39] Marilyn Marietta testified that after Salina Steel filed its proof of claim for $188,232.62 it was able to resell to other customers or sell for scrap the product it was able to retrieve from Auto Lifters. The total proceeds of these sales were $5,253.39 and after deducting a 20% restocking fee [20% of the amount *invoiced* for this retrieved product], which Marietta described as a handling fee, Salina Steel credited Auto Lifters account in the amount of $1,320.41 leaving a current claim of $186,912.21. *See* Ex. 3 (Ex. 4 credit memo within).

-17-

done in the name of the corporation.[40]

In a later opinion, the Kansas Court of Appeals listed several factors courts consider for determining whether the corporate entity should be disregarded, noting that each case "must rest upon its special facts."[41] Stating initially that courts should start from the premise that a corporation and its shareholders are presumed separate and distinct, the court stated that eight factors should be considered:

> (1) undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.[42]

Some, but not all of those factors appear here. While the capitalization of the company was thin, there appears to have been adequate capital at the time the PCI loan was made by Auto Lifters in 1998. The lift business ran profitably until 2003. Auto Lifters and Aerotech (and all of Anderson's entities) were one-man corporations or companies, owned and run by him with the help of two or three subordinate managers. Anderson did not maintain good minute books for the companies, but he did annually file franchise tax reports with the Secretary of State and file federal and state tax returns regularly and on time. The corporations maintained detailed books and records and separate bank accounts. They did not adequately document the PCI loan. Nor do the corporations appear to have been a facade for Anderson's business interests. Indeed, the business

---

[40] 205 Kan. 787, 797, 473 P.2d 33 (1970).

[41] *Kvassay v. Murray*, 15 Kan. App.2d 426, 436, 808 P.2d 896, *rev. denied*, 248 Kan. 996 (1991).

[42] *Id.* at 437, citing *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743, Syl. ¶ 3 (1983).

was profitable and successful for a considerable period of time before it soured in 2004.

Of principal concern to the Court is whether Anderson's actions with the companies' assets amounted to the promotion of a fraud or injustice. On this record, the Court finds that they did not. This fact pattern is no different than many that the Court sees on a day to day basis: an individual with an idea incorporates a business that he owns, but does not scrupulously observe the corporate formalities, particularly with respect to the company's money. This evidence, standing alone, is not sufficient to pierce the corporate veil where the creditors do not show that the corporate form was "used to cover fraud or work injustice."[43] Here it appears that Anderson on one occasion "borrowed" $220,000 from Auto Lifters at a time when it was profitable and had positive retained earnings. His loan did not render the company insolvent. In the ensuing seven years, Anderson's companies paid many creditors thousands of dollars. Both Salina Steel and Central Plains did business with these companies until very shortly before they closed down. Both Salina Steel and Central Plains were paid thousands of dollars on their invoices. The Court is also mindful that Anderson personally borrowed funds, secured by proceeds from his PCI real estate dealings, and infused those funds into his companies to keep them afloat and enable them to pay operating expenses. In the absence of any other damning circumstances, the failure to repay the 1998 loan by 2005 does not form a secure basis upon which to determine that Anderson was acting to cover fraud or work injustice.

The Court notes that this is a very different factual setting than that in *Poynter*, where the individual owners formed one company, essentially ignoring the corporate formalities, and when that company failed, transferred all its assets to a second company. When the second company

---

[43] *Kvassay*, 15 Kan. App.2d at 426.

-19-

failed, the assets were again conveyed to a third company and, when it failed, the individuals liquidated them and paid the proceeds on personal debts to the prejudice of corporate claimants.

*Golconda Screw, Inc. v. West Bottoms Ltd.*, a case heavily relied upon by Central Plains, features a similar factual scenario where the corporation's sole asset was transferred to a new entity owned and held by selected creditors of the individuals (not West Bottoms) in an effort to defeat the corporate creditors claims.[44] Both the trial court and the Court of Appeals had little hesitation in concluding that the corporation had been used to promote an injustice and disregarded the corporate entity.

In short, Kansas courts are to exercise the power to pierce "reluctantly and cautiously."[45] That injunction prevents this Court from piercing the corporate veil here. Accordingly, Central Plains has no claim against Bruce Anderson or his bankruptcy estate and is not a creditor in this case. Therefore, it lacks standing to object to the exemption of his homestead. The debtor's objection to Central Plains proof of claim should be sustained and Central Plains' objection to debtors homestead exemption objection is dismissed.

### B. Salina Steel's Objection to Debtor's Homestead Exemption under § 522(o).

Salina Steel objects to the exemption of Anderson's homestead under new § 522(o). It has the burden of proving the exemption is improperly claimed.[46] As noted previously, this section is one of those provisions of BAPCPA that was effective upon its enactment.[47] It provides as follows:

---

[44] 20 Kan. App. 2d 1002, 894 P.2d 260 (1995).

[45] *Id.* at 1012.

[46] *In re Hodes,* 402 F.3d 1005, 1010 (10th Cir. 2005).

[47] *See* note 2, *supra.*

(o) For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in--

(1) real or personal property that the debtor or a dependent of the debtor uses as a residence;

(2) a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence;

(3) a burial plot for the debtor or a dependent of the debtor; or

(4) real or personal property that the debtor or a dependent of the debtor claims as a homestead;

shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.[48]

Section 522(b)(3)(A) provides for the exemption by the debtor of property that is exempt under state or local law applicable where the debtor is domiciled on the petition date and has been domiciled for the 730 days preceding that date.  Anderson has resided in Kansas for many years and, as a Kansas domiciliary, would be entitled to claim as exempt a homestead of unlimited value under Article 15, § 9 of the Kansas Constitution and KAN. STAT. ANN. § 60-2301 (2005).  New § 522(o) reduces the value of that exemption to the extent such value can be (1) attributed to property disposed of in the ten years preceding filing; (2)with intent to hinder, delay or defraud a creditor; (3) that the debtor could not otherwise exempt under § 522(b) on the petition date.  In appropriate cases, this statute works a significant, if not historical change on the manner in which the pre-filing conversion of non-exempt assets to exemptions in Kansas must be treated in bankruptcy.

Here the Court can easily attribute the value of Anderson's homestead to property disposed of within ten years of the petition date.  He paid down his mortgage obligation with non-exempt assets within a few months of filing.  These funds may be traced back to the Conway Bank $100,000

---

[48]  11 U.S.C. § 552(o) (Thomson/West 2008).

CD acquired with proceeds from the second PCI sale, the net proceeds of the Newton land and plant sold by Anderson to Bob Coleman in the spring of 2005, and the amount remaining from the $100,000 CD pledged to the Hesston Bank for a $100,000 line of credit. These funds were clearly property that Anderson could not have exempted on the petition date. This leaves the Court to determine whether Anderson made the transfers of funds to Capitol Federal (his home mortgage lender) with intent to hinder, delay or defraud a creditor or creditors.

Although § 522(o) is new, numerous courts have concluded that the "hinder, delay, defraud" element is to be interpreted and enforced in the same manner as it is found in other sections of the Bankruptcy Code, namely a discharge objection proceeding under § 727(a)(2)(A) or an action to recover a fraudulent transfer under § 548(a).[49] As United States Bankruptcy Judge Dale L. Somers has stated in *In re Agnew*,[50] the objecting party has the burden of proving by a preponderance of the evidence that some or all of the factors that would control a decision under either of the above-cited statutes are present.[51] In particular, when denying a discharge under § 722(a)(2)(A) based upon pre-petition conversion of assets, he stated:

> In the Tenth Circuit [actual intent to defraud] can be evidenced by the following situations and actions as a basis to infer fraudulent intent: Debtor conceals prebankruptcy conversions; debtor converts assets immediately before filing; debtor continues to use the transferred property; the transfer is made to family members; debtor obtained credit in order to purchase exempt property; the conversion occurred after the entry of a large judgment against the debtor; debtor had engaged in a pattern of sharp dealing prior to bankruptcy; and the conversion rendered the debtor insolvent. However, the Tenth Circuit has also cautioned that the "mere fact that a

---

[49] *In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006); *In re Lacounte,* 342 B.R. 809, 814 (Bankr. D. Mont. 2005); *In re Maronde*, 332 B.R. 593, 599 (Bankr. D. Minn. 2005); *In re Sissom*, 366 B.R. 677, 692 (Bankr. S.D. Tex. 2007).

[50] 355 B.R. 276 (Bankr. D. Kan. 2006).

[51] *Id.* at 284-85.

transaction occurred soon before the filing of bankruptcy does not necessarily support the inference of fraud," as the circumstances of the transaction must be examined. A legitimate purpose for a transfer supports the finding of no fraudulent intent.[52]

Referring to the applicable badges of fraud for a § 548 claim, Judge Somers stated that:

> The circumstantial evidence establishing the badges of fraud under this subsection are similar to those discussed above from cases under 727(a)(2)(A). The following are identified by the Tenth Circuit BAP:
>
>> Relevant factors include whether the transfer was to an insider; whether the debtor retained possession or control of the property after the transfer; concealment of the transfers; pending or threatened litigation against the debtor at the time of the transfer; a transfer of substantially all of the debtor's assets; absconding by the debtor; removal or concealment of assets; reasonably equivalent value in exchange for the transfer; debtor's insolvency at the time of the transfer; the proximity in time of the transfer to the incurrence of a substantial debt; and a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to it [sic] insider of the debtor. Transfers to family members are subject to particularly close scrutiny. The relationship of the parties in conjunction with other circumstances often provides compelling evidence of fraud.[53]

Judge Somers also points out, as do other judges, that the simple fact of a debtor's prepetition conversion of nonexempt assets to exempt status is not, standing alone, sufficient to support a finding of fraudulent intent.

In the *Agnew* case, on the eve of filing, the debtor traded a fractional interest in nonexempt farm ground and farm equipment to his aging mother for her homestead which he, in turn, claimed

---

[52] *Id.* at 285 (Bankr. D. Kan 2006), citing *Marine Midland Business Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073 (10th Cir. 1991); *Gullickson v. Brown (In re Brown),* 108 F.3d 1290 (10th Cir. 1997) and *Mcorp Management Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839 (10th Cir. 1990).

[53] *Id.* at 286, *quoting Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 782 (10th Cir. BAP 2001).

as his homestead when he filed his case.[54]  There was evidence that she had intended to leave him the house upon her death and that this trade had aspects of estate planning.  The Agnew debtor owned the property he traded outright.  He did not conceal the trade or borrow to complete the transaction.  He did not participate in sharp dealing.  Accordingly, the court concluded that the trustee had not shown an actual intent to defraud.

By contrast, in *In re Lacounte*, the court found that the debtor had engaged in self-dealing and colluded with family members in the sale of property to them and the payment of the proceeds to his mortgage-holder.[55]  There the debtor's wife incurred most of the couple's debts gambling and the debtor testified that he converted his assets to pay down his homestead loan because he was angry that his creditors would otherwise receive all that he had worked for over his lifetime.  In *In re Maronde*, the debtor was found to have supplemented his homestead with funds he obtained by drafting credit cards.[56]  In *In re Keck*, the debtor obtained cash advances using credit card accounts and used the cash advances to make home improvements and pay off a home equity line of credit.[57] The debtor stopped taking cash advances immediately after the home equity line was paid off, leaving a $66,000 unsecured debt from the credit card advances.  The debtor failed to disclose the transfers on his statement of financial affairs.  United States Bankruptcy Judge Janice Miller Karlin noted in *Keck* that it was not a case where the debtor converted non-exempt property he already owned to exempt property.

_____

[54]  Debtor had lived on his 90 year old mother's homestead for several years and leased the property from her trust.

[55]  342 B.R. 809 (Bankr. D. Mont. 2005).

[56]  332 B.R. 593 (Bankr. D. Mont. 2005).

[57]  363 B.R. 193 (Bankr. D. Kan. 2007).

-24-

Anderson's actions fall somewhere in between these two extremes. Anderson did not conceal the funds he used to pay down his homestead loan, nor did he fail to disclose the prepayments He did convert these non-exempt assets to exempt status approximately three months before filing bankruptcy. He did so while Salina Steel's suit against him personally was pending, but no judgment had been entered against him. He retained use of the funds in the sense that he retains his home, but the funds were applied to his mortgage balance. By paying these funds on his mortgage and increasing his home equity, he essentially benefitted not only himself but his wife and any other family members who occupy the residence. He did not borrow these funds in the same sense as the debtor in *Keck*, but rather he liquidated non-exempt assets he already owned. Nor can it be said that Anderson participated in sharp dealing; rather, it appears that he became embroiled in a business concern that required more management skill and ability than he appears to have possessed. With respect to the insolvency badge, no firm evidence was presented by Salina Steel that the $240,000 transfer rendered debtor insolvent. The transfer was neutral in the sense that it did not alter debtor's balance sheet or net worth; it did convert non-exempt liquid assets to an exempt asset beyond the reach of creditors.

Turning to the § 548 factors that are different from or in addition to those considered under § 727(a), Anderson was subject to litigation at the time he made the transfer. By May of 2005 Salina Steel had sued Anderson personally, but no judgment had been obtained against him before his bankruptcy filing. It was not a transfer of all his assets, nor did he abscond with any assets. He appears to have received reasonably equivalent value for the transfer – a dollar for dollar reduction of the mortgage debt encumbering his home.

When he was pressed for a reason why he paid down his mortgage instead of his creditors,

Anderson responded "I don't know." While this may have "hindered" his creditors, in the absence of better evidence to the contrary, this Court cannot conclude that Salina Steel has demonstrated that he made this transfer with actual intent to hinder, delay or defraud. Three of the eight factors considered under § 727(a) are shown. Three of the eleven factors considered under § 548(a) appear. It is true that, in both analyses, his transfer benefitted his family to the detriment of his creditors and that this factors is said to bear more scrutiny than most.

This is a close case. It does not feature the blatant misconduct engaged in by the debtors in *LaCounte* where assets were concealed to prevent collection after insolvency caused by gambling losses, or *Keck*, where the debtor improved his homestead with the proceeds of credit card advances. Nor does it share the more benign fact pattern shown in *Agnew*, where the debtor was to have inherited the homestead property from his aged mother even before she transferred the land to him. Indeed, the Court heard no evidence of debtor's explanation for or purpose of the transfer that would shed light, one way or the other, on his actual intentions. While this is troubling to the Court, in the absence of direct or circumstantial evidence demonstrating his fraudulent intent by a preponderance of the evidence based upon the presence of the badges of fraud, this Court cannot sustain Salina Steel's objection.

As another court has stated, "Substantial evidence of prebankruptcy planning to pay down a mortgage on a homestead using nonexempt assets is not sufficient [to] deny discharge, as actions to hinder, delay, or defraud creditors require something more."[58] Other courts interpreting § 522(o) appear to agree. The circumstances here lack "something more." There is no reason to believe that

---

[58] *In re Agnew, supra* at 285, citing *In re Carey*, *supra* at 1077 (addressing a claim under § 727(a)(2)(A)).

-26-

case law interpreting the § 727(a)(2)(A) exception to discharge should not guide the courts' interpretation and application of a § 522(o) objection.  In short, the Court concludes that the debtor here did nothing more than take advantage of an exemption to which he is entitled.  While his actions were intentional, the Court cannot find that they were done with the intent to hinder, delay or defraud.[59]  Therefore, the objection of Salina Steel to the debtor's homestead exemption under § 522(o) is OVERRULED.

# # #

---

[59] *See* 4 COLLIER ON BANKRUPTCY ¶ 522.08[5].  (Section 522 continues the position that "mere conversion of nonexempt property into exempt property, without fraudulent intent, does not deprive the debtor of exemption rights in the converted party.").

-27-